**STATE of Missouri, Respondent,**

v.

**Lionel E. WOOLLEN, Appellant.**

**No. WD 32596.**

Missouri Court of Appeals, Western District.

Oct. 5, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 30, 1982.

Patrick E. White, Kansas City, for appellant.

John Ashcroft, Atty. Gen., John Jacobs, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, C.J., and TURNAGE and CLARK, JJ.

TURNAGE, Judge.

Lionel E. Woollen was found guilty by a jury of second degree murder in the death of his wife Margaret. In accordance with the jury's recommendation, the court sentenced him to 20 years confinement. On this appeal, Woollen contends the trial judge erred in failing to disqualify himself prior to conducting a hearing on a motion for new trial, and in failing to grant a new trial on grounds of newly discovered evidence. Affirmed.

Margaret Woollen died on July 12, 1980. At the time of her death, she and Lionel had been married just over six months. At about 9:30 p.m. on July 12, Woollen called the police to his home in Kansas City. Upon arriving there, police officers found the body of Margaret lying face down on the floor of the kitchen with a butcher knife in her hand. Woollen told the officers that his wife had attacked him with the butcher knife, and that he had choked her in self-defense.

Margaret's head and arms were covered with blood, and there was considerable blood on the floor. An attempt had been made to wipe up the blood with newspapers and magazines, which were found in the trash can. The knife rack on the kitchen wall was also smeared with blood, and had a vacant space for the butcher knife found in Margaret's hand. Margaret's glasses were found folded on the counter, with a gold wedding band around one of the eye pieces. The glasses also contained blood stains.

The Jackson County Medical Examiner testified that the caked blood on Margaret's face came from a broken nose. She also found hemorrhaging and swelling on the surface of the eyes, and a deep cut at the corner of the right eye. The examiner stated she had found bruises and scratches on

Margaret's arms, which she described as defense wounds which Margaret had incurred while attempting to ward off blows from some blunt object. There was extensive damage to the neck, including at least 20 scratches and associated bruises.

The examiner gave her opinion that the cause of death was strangulation from the rear. The examiner further testified that Margaret would not have been able to maintain a grasp on the knife found in her hand during the beating and strangulation which she suffered. A fingerprint expert testified that there were no fingerprints of value found on the knife in Margaret's hand.

A chemist testified that all of the blood found in the kitchen and on the objects described was Margaret's. He also testified that blood found on Woollen's clothing and on the points, bottoms, and tops of Woollen's cowboy boots was Margaret's. In addition, there appeared to be hair patterns on the boots.

Woollen testified that he was 60 years old, a retired government employee, and out-weighed his wife by several pounds. He said that on the evening in question, he and Margaret had gone to a restaurant. When he pointed out to Margaret that there was a special being featured, she told him that he was not going to tell her what to eat, ran to the car, and left. Woollen was forced to pay a man five dollars to take him home.

Woollen said that when he arrived home, he and Margaret discussed the incident at the restaurant for about thirty minutes in a calm fashion. He said that Margaret then seized a butcher knife from the holder on the wall, and advanced toward him. Woollen testified that he then grasped Margaret's hand with both his hands, whereupon she kicked him with great force in the groin, causing him such great pain, that he could not recall what happened after that. His next recollection was of being in a state of shock when he saw Margaret's body on the floor. He called Margaret's mother in Higginsville, his daughter by a previous marriage, and then the police.

Woollen was represented by a Kansas City attorney experienced in defending criminal cases. After the trial, this attorney filed a motion for a new trial in which several trial errors were alleged. Thereafter, a supplemental motion for new trial was timely filed by new counsel. This motion alleged that Woollen was suffering from a mental disease or defect at the time of the death of his wife. The motion alleged that this newly discovered evidence was unknown to Woollen, and therefore had not been previously presented.

After the motions for new trial were filed, the court took up the original motion and overruled it, but stated that no ruling would be made on the supplemental motion until a hearing was held. The court did state that it had received a number of letters expressing the view that Woollen constituted a danger to the community, and should not have been released on bond. The court then revoked Woollen's bond, and ordered him into custody.

About a week after the court revoked Woollen's bond, Woollen's new counsel filed a motion to disqualify the judge on grounds that the judge had considered ex parte communications in revoking the bond. Woollen's counsel maintained that in light of the court's consideration of these letters, Woollen could not have a fair trial on the supplemental motion. The court overruled the motion for disqualification. Subsequently, a hearing was held on the supplemental motion, and it too was overruled.

Woollen first contends that the court erred in refusing the motion to disqualify the judge on the ground that he had considered the letters from various people, including members of Margaret's family. The letters were placed in the court file, and there is no indication that the judge answered any of these.

■ Woollen lost the right to peremptory disqualification of the trial judge at the swearing of the panel on voir dire. *State ex rel. O'Brien v. Murphy*, 592 S.W.2d 194, 196[3] (Mo.App.1979). However, the *Murphy* court stated that it would be error for a

trial judge to fail to recuse himself at any step of the proceeding if he were, in fact, unfavorably predisposed toward the defendant. *Id.* at 197[5]. The court in *Murphy* concluded that communications sent to the judge without response by him are not sufficient to warrant disqualification on the grounds of actual bias.

■ The letters received by the court in this case were all devoted to the question of whether or not Woollen should be released on bond, and none were concerned with the merits of the motion for a new trial. Examination of the record does not reveal any prejudice on the part of the trial court against Woollen. Thus, there was no error in refusing the motion to disqualify the judge at the post trial proceedings.

■ Woollen next claims that he was entitled to a new trial on the basis of newly discovered evidence that he was suffering from a mental disease or defect. Woollen contends the court had prejudged his supplemental new trial motion to this effect. At the conclusion of the bond hearing and after overruling the original motion for new trial, the judge stated that he had observed Woollen during the trial and at the subsequent hearing, and that he saw no reason for the court to order a mental examination on its own motion. This did not indicate that the court had prejudged the supplemental motion, but merely explained why the court had not ordered a mental examination on its own motion pursuant to Section 552.020 RSMo. 1980.

Woollen's defense of mental disease or defect was not raised within the time limits set forth in Section 552.030 RSMo. 1980. In fact, the first mention of this defense was in the supplemental motion for new trial. At the hearing on the supplemental motion, Woollen presented a psychiatrist who testified that he was a native of Argentina, had attended medical school there, and had received additional training in this country. This physician stated that he had examined Woollen for two hours in the jail on the previous day. He said he found nothing specifically wrong with Woollen, who was answering coherently and speaking normally. The physician stated that the night after the examination, he began to think about the fact that Woollen had been married four times, and reached the conclusion that Woollen was suffering from a manic-depressive psychosis. The physician stated, however, that to be certain of this diagnosis, he would have to hospitalize and observe Woollen for thirty days. When asked if he thought Woollen knew right from wrong at the time he killed his wife the physician said he "would almost say no." When asked if Woollen knew he had this disease he stated "This is debatable, but, to take a safe and honest side, he was probably not aware."

No other evidence was presented on the motion. It is, however, important to note that prior to the trial, Woollen's counsel placed his client on the stand to get his consent for an attorney who was then with the Public Defender's office, but had previously been on the prosecutor's staff, to assist in his defense. Woollen agreed this attorney could participate. At the conclusion of Woollen's testimony, his attorney asked him, "you're in good health today and you understand what is going on?" Woollen answered, "yes."

There is no contention that Woollen should not have gone to trial because of an inability on his part to understand the nature of the proceedings, or because of any impairments in his ability to communicate with his attorney. The only contention is that he suffered from a mental disease or defect at the time he killed his wife.

■ The trial court is vested with a great deal of discretion in deciding whether or not a new trial should be granted because of newly discovered evidence, and the courts do not favor the granting of a new trial on that ground. *State v. Harper*, 473 S.W.2d 419, 421[1] (Mo. banc 1971). In motions made to the trial judge in criminal cases, the appellate court must regard the trial court as having had the opportunity to observe a witness's demeanor on the stand, and thus defer to the trial court's determination of the witness's credibility, unless it

clearly and convincingly appears that it has abused its discretion. *Harris v. State,* 603 S.W.2d 16, 17[3] (Mo.App.1980); *Peterson v. State,* 444 S.W.2d 673, 676[5] (Mo.1969), *cert. denied* 398 U.S. 931, 90 S.Ct. 1827, 26 L.Ed.2d 95 (1970), *reh. denied* 399 U.S. 937, 90 S.Ct. 2257, 26 L.Ed.2d 810 (1970); and *Walster v. State,* 438 S.W.2d 1, 2–3[1] (Mo. 1969).

Thus, the trial court had the discretion to disbelieve the psychiatrist's testimony offered in support of Woollen's supplemental motion for new trial. This court must defer to the trial court's judgment as to the physician's credibility, absent clear and convincing proof that it abused its discretion. The record supports the finding by the trial court that the testimony of the physician was not believable. Woollen's testimony throughout the trial was coherent and consistent. Woollen was represented by an experienced trial attorney, who did not request that Woollen undergo a mental examination. The physician admittedly made a tentative diagnosis in two hours, whereas he admitted it would require 30 days to make a firm evaluation of Woollen. Finally, Woollen stated, immediately prior to trial, that he was in good health, and understood what was going on. These factors convince this court that there was no abuse of discretion in disbelieving the testimony of the psychiatrist.

Considering the evidence produced to show mental disease or defect, the time this defense first appears, the finding by the court that the evidence offered in support of this defense was not credible, and the fact that Woollen testified in a coherent and consistent manner, even in the face of vigorous cross-examination, this court does not find that the trial court abused its discretion in overruling the motion for new trial.

The judgment is affirmed.

All concur.